IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LISTINGBOOK, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | 1:13-cv-583 |
| | ) | |
| MARKET LEADER, INC., | ) | |
| | ) | |
| Defendant/Counter-Claimant. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Listingbook, LLC, ("Listingbook") brings this action against Market Leader, Inc.,

("Market Leader") alleging patent infringement in violation of the Patent Act of 1952, 35

U.S.C. § 100–376 (2012). (Compl. ¶¶ 1, 24–25, ECF No. 1.) Market Leader moves for

summary judgment, asserting that certain claims of Listingbook's patent are ineligible for

patent protection under § 101 of the Patent Act and are thus invalid.[1] (See Def.'s Mot. 1,

ECF No. 55.) The Court heard oral argument on September 3, 2015. For the reasons

below, the Court grants Market Leader's Motion for Summary Judgment (ECF No. 55).

**I.     BACKGROUND**

Listingbook owns U.S. Patent No. 7,454,355 ("the '355 Patent"), entitled "Method

and System for Providing Real Estate Information Using a Computer Network, Such as the

---

[1] In its Motion for Summary Judgment, Market Leader argues that Listingbook's *patent* is invalid
under § 101. (Def.'s Mot. 1, ECF No. 55.) In its brief, Market Leader clarified that it seeks to
invalidate only the patent *claims* that Listingbook asserts Market Leader has infringed. (See Def.'s
Mem. 1, ECF No. 56 (arguing that "[t]he asserted claims" of Listingbook's patent are invalid).)
Because the Court cannot determine the validity of claims that are not at issue, see Fox Grp., Inc. v.
Cree, Inc., 700 F.3d 1300, 1301–02 (Fed. Cir. 2012), the Court limits its analysis to the claims
Listingbook has asserted as infringed and Market Leader has challenged as invalid.

Internet." ('355 Patent 1, ECF No. 57-3; <u>see</u> Compl. ¶ 6, ECF No. 1.)  In its patent

specification, Listingbook describes a method and system where real estate agents use

computers to log onto a website and create individual client accounts containing information

about each client.  (<u>See</u> '355 Patent 9:49–63, ECF No. 57-3.)  In addition to contact

information, client accounts may include information related to the clients' property search

criteria, such as preferred price range, number of bedrooms, and square footage.  (<u>See</u> <u>id.</u> at

9:57–63, 10:50–11:14.)  This criteria is then used to search for properties in a real estate

information database.  (<u>See</u> <u>id.</u> a t 14:27–30.)  After logging into their accounts, clients can

view properties found by the agent, tag properties for future reference, and if authorized,

conduct their own searches of the real estate information database.  (<u>See</u> <u>id.</u> at 4:27–59,

14:30–42.)  The clients' online activity is monitored and recorded in the system.  (<u>See</u> <u>id.</u> at

5:21–22; 9:37–43.)  Agents can then access a "buyer list," a webpage presenting client activity

information in summary form.  (<u>See</u> <u>id.</u> at 11:15–19.)  From the buyer list, agents can learn

whether any clients have logged into their accounts, the number of properties each client has

viewed, and the number of properties each client has tagged, all since the last time the agent

accessed that particular information for each client on the list.  (<u>See</u> <u>id.</u> at 3:61–4:5, 4:27–65.)

The buyer list also indicates the number of properties fitting each client's property search

criteria that have been changed or added to the real estate information database since the last

time the agent accessed that information.  (<u>See</u> <u>id.</u> at 4:6–26.)  Each data point in the buyer

list appears as a hyperlink leading the agent to a webpage with more detailed information,

such as the precise properties that have been viewed, tagged, changed, or added.  (<u>See</u> <u>id.</u> at

5:32–54.)

These features of Listingbook's invention can generally be found in the thirty-eight claims of Listingbook's patent. Of those thirty-eight claims, twenty-five are at issue in this summary judgment motion: Claims 1 to 10, 16 to 26, 28, 34, 37, and 38. (See Pl.'s Disclosure of Asserted Claims 1–2, ECF No. 29-6; Def.'s Mem. 1, ECF No. 56.) Of the claims at issue, Claims 1, 37, and 38 are independent claims, while the remaining claims are dependent on Claim 1.[2] Claim 1 reads as follows:

> A computer-implemented method of providing client-accessed real estate information to a real estate professional associated with a first client and a second client, and for providing professional-accessed real estate information to the first client and the second client, the method comprising:
>> connecting to a database of real estate information;
>> providing the professional with access to the real estate information;
>> storing a first account for the first client and a second account for the second client, the first account and the second account being authorized by the professional;
>> providing the first client with access to the first account and providing the second client with access to the second account;
>> providing the first client, when accessing the first account, with access to the real estate information;
>> providing the second client, when accessing the second account, with access to the real estate information;
>> monitoring actions of the professional while the professional is accessing the real estate information;
>> monitoring actions of the first client while the first client is accessing the first account;
>> monitoring actions of the second client while the second client is accessing the second account;
>> generating and storing professional-accessed real estate information for the first client and the second client in response to the actions of the professional as the professional reviews the real estate information;

---

[2] A dependent claim "contain[s] a reference to a claim previously set forth and then specif[ies] a further limitation of the subject matter claimed." 35 U.S.C. § 112(d). The dependent claims in Listingbook's patent depend either on Claim 1 or a claim that is dependent on Claim 1.

generating and storing first client-accessed real estate information in response to the actions of the first client;

generating and storing second client-accessed real estate information in response to the actions of the second client;

providing at least some of the first client-accessed real estate information and at least some of the second client-accessed real estate information to the professional, thereby providing the professional with knowledge of the actions of the first client and the actions of the second client; and

providing at least some of the professional-accessed real estate information for the first client to the first client and at least some of the professional-accessed real estate information for the second client to the second client, thereby providing the first client and the second client with knowledge of the actions of the real estate professional.

Claim 37 requires a "computer-readable medium for storing instructions which, when executed on a processor," perform the method described in Claim 1, while Claim 38 requires a "system" comprising "a server," "a communications circuit for connecting the server to the internet," and a "component" for performing each step of the method described in Claim 1.

Market Leader moves for summary judgment, arguing that the claims at issue are patent-ineligible under § 101 of the Patent Act because "they are directed to abstract ideas and functions to be implemented on conventional computers," making the claims invalid. (Def.'s Mem. 1, ECF No. 56.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the litigation, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary

judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). To defeat summary judgment, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." Id. at 324. The nonmoving party must support its assertions by citing to particular parts of the record, such as affidavits, depositions, answers to interrogatories, and admissions on file. Fed. R. Civ. P. 56(c)(1); Celotex, 477 U.S. at 324.

The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. A genuine issue for trial exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249–50 (citations omitted). When reviewing a motion for summary judgment, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).

## III. DISCUSSION

Section 101 of the Patent Act defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court interprets this provision to include an implicit exception: "Laws of nature, natural phenomena, and abstract ideas are not patentable." Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347, 2354 (2014) (quoting Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 133 S. Ct. 2107, 2116

(2013)). Though the Supreme Court recognizes that "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," <u>Mayo Collaborative Servs. v. Prometheus Labs., Inc.</u>, 132 S. Ct. 1289, 1293 (2012), it concludes that these concepts are "the basic tools of scientific and technological work" and to grant a monopoly on them, through a patent, "'might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws," <u>Alice</u>, 134 S. Ct. at 2354 (quoting <u>Myriad</u>, 133 S. Ct. at 2116; <u>Mayo</u>, 132 S. Ct. at 1293). However, while laws of nature, natural phenomena, and abstract ideas are themselves patent-ineligible, an application of an ineligible concept "'to a new and useful end' . . . remain[s] eligible for patent protection." <u>Id.</u> (quoting <u>Gottschalk v. Benson</u>, 409 U.S. 63, 67 (1972)).

The Supreme Court has set forth a two-step framework ("the <u>Alice</u> framework") for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." <u>Id.</u> at 2355. First, a court must determine whether the claims at issue are directed to a patent-ineligible concept. <u>Id.</u> If so, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." <u>Id.</u> (quoting <u>Mayo</u>, 132 S. Ct. at 1298, 1297). In this step, the court searches for an "inventive concept" to ensure that in practice, the patent "amounts to significantly more than a patent upon the [ineligible concept] itself." <u>Id.</u> (alteration in original) (quoting <u>Mayo</u>, 132 S. Ct. at 1294).

## A. Presumption of Validity & Standard of Proof

Before turning to the merits of Market Leader's motion, the Court must first decide whether to apply a presumption of validity and standard of proof when evaluating the

motion. Listingbook argues that "[t]o prevail on its motion, Market Leader must show, by clear and convincing evidence, that none of the asserted claims meet the statutory requirements of 35 U.S.C. § 101." (Pl.'s Opp'n 1, ECF No. 57.) Market Leader argues that the clear and convincing standard of proof does not apply in this case because "burdens of proof . . . apply only to questions of fact," and "[w]hether a claim is directed to patentable subject matter is a question of law." (Def.'s Reply 1, ECF No. 58.)

This dispute stems from recent uncertainty about whether a presumption of validity and standard of proof apply in cases challenging patent-eligibility under § 101. Under § 282(a) of the Patent Act, "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). The Supreme Court held in Microsoft Corp. v. i4i Limited Partnership that to overcome the presumption of validity, a party asserting invalidity must prove its defense by clear and convincing evidence. 131 S. Ct. 2238, 2242 (2011). In a concurring opinion, Justice Breyer emphasized that "the evidentiary standard of proof applies to questions of fact and not to questions of law," meaning that where a claim of invalidity rests "not upon factual disputes, but upon how the law applies to facts as given," the clear and convincing standard of proof "has no application." Id. at 2253 (Breyer, J., concurring). Since the Supreme Court issued its decision in Microsoft, courts have been divided over the applicability of the presumption of validity and standard of proof in § 101 cases.

In its recent § 101 decisions since Microsoft, the Supreme Court has not mentioned the presumption of validity or standard of proof. See Alice, 134 S. Ct. 2347; Myriad, 133 S. Ct. 2107; Mayo, 132 S. Ct. 1289; see also Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 720–

21 (Fed. Cir. 2014) (Mayer, J., concurring) ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility."). The Federal Circuit also has not issued a controlling decision on the issue. Federal Circuit Judges Rader and Lourie, however, have authored concurring, dissenting, and now-vacated opinions stating that the presumption of validity and/or the standard of proof do apply in § 101 cases.[3] Arriving at the opposite conclusion, Judge Mayer of the Federal Circuit has written in a concurring opinion that "no presumption of eligibility should attach when assessing whether claims meet the demands of section 101." Ultramercial, 772 F.3d at 720 (Mayer, J., concurring). He cited the rationale for the presumption of validity—that a claim is presumed valid because the United States Patent and Trademark Office ("PTO") has approved the claim "in its expertise"—and explained that the rationale is diminished in § 101 cases because "the PTO has for many years applied an insufficiently rigorous subject matter eligibility standard." Id. Judge Mayer also noted the Supreme Court's silence on the issue in its recent § 101 decisions and concluded that "[t]he reasonable inference, therefore, is that while a presumption of validity attaches in many

_____

[3] Before Alice reached the Supreme Court, the Federal Circuit heard the case en banc and issued a one-paragraph per curiam opinion along with several separate opinions. See CLS Bank Int'l v. Alice Corp. Pty. Ltd., 717 F.3d 1269, 1273 (Fed. Cir. 2013) (en banc), aff'd, 134 S. Ct. 2347 (2014). Judge Lourie, writing for a five-member plurality, noted that "all issued patent claims receive a statutory presumption of validity" and "that presumption applies when § 101 is raised as a basis for invalidity." Id. at 1284 (Lourie, J., concurring). Chief Judge Rader, writing for four judges, explained that "the presumption of validity applies to all challenges to patentability, including those under Section 101." Id. at 1304 (Rader, C.J., concurring in part and dissenting in part). He therefore found that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." Id. at 1304–05. Chief Judge Rader reiterated this position for a majority of the court in a decision in Ultramercial, Inc. v. Hulu, LLC, which the Supreme Court vacated and remanded for further consideration in light of Alice. 722 F.3d 1335, 1342 (Fed. Cir. 2013), vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC, 134 S. Ct. 2870 (2014). Considering Ultramercial on remand, Judge Lourie authored an opinion that did not mention either the presumption of validity or the standard of proof. See 772 F.3d 709 (Fed. Cir. 2014).

contexts, no equivalent presumption of eligibility applies in the section 101 calculus." Id. at 720–21 (citation omitted).

Given the uncertainty in the law, district courts have taken various approaches when addressing the presumption of validity and standard of proof in § 101 cases. See, e.g., Broadband iTV, Inc. v. Oceanic Time Warner Cable, LLC, --- F. Supp. 3d ---, 2015 WL 5768943, at *3 (D. Haw. 2015) (declining to apply the presumption of eligibility but requiring clear and convincing evidence to prove underlying questions of fact); Exergen Corp. v. Brooklands Inc., --- F. Supp. 3d ---, 2015 WL 5096464, at *2 (D. Mass. 2015) (applying the clear and convincing standard of proof "[g]iven the plain language of 35 U.S.C. § 282 which codifies a general presumption of validity and the fact that no Supreme Court or Federal Circuit majority has disavowed the presumption of validity for § 101"); Intellectual Ventures I LLC v. Symantec Corp., --- F. Supp. 3d ---, 2015 WL 1843528, at *6 (D. Del. 2015) (finding it unnecessary to resolve the issue because the patents would be patent-ineligible with or without the clear and convincing standard of proof).

Absent a controlling opinion from the Supreme Court or Federal Circuit holding that the presumption of validity and clear and convincing standard of proof do not extend to § 101 challenges, the Court will apply both the presumption and the standard of proof in this case. However, the Court agrees with Justice Breyer that "the evidentiary standard of proof applies to questions of fact and not to questions of law." Microsoft, 131 S. Ct. at 2253 (Breyer, J., concurring). The Federal Circuit made a similar observation when considering invalidity based on obviousness:

> [W]e find it inappropriate to speak in terms of a particular standard of proof being necessary to reach a legal conclusion. Standard of proof relates to specific factual questions. While undoubtedly certain facts in patent litigation must be proved by clear and convincing evidence, the

9

> formulation of a legal conclusion on validity from the established facts is a matter reserved for the court.

SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n, 718 F.2d 365, 375 (Fed. Cir. 1983) (citation omitted); see also Alza Corp. v. Mylan Labs., Inc., 464 F.3d 1286, 1289 (Fed. Cir. 2006) (explaining that because "a patent retains its statutory presumption of validity, . . . the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to *underlying facts*" (emphasis added) (citation omitted) (quoting McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1349 (Fed. Cir. 2001)); R.R. Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506, 1515 (Fed. Cir. 1984) (stating that "legal conclusions are not proved; facts are").

When applying the presumption of validity, the Court likewise distinguishes between questions of fact and questions of law. Though the Federal Circuit has not issued a controlling decision on the presumption of validity, it has addressed a presumption of correctness in the context of international trade. In Universal Electronics Inc. v. United States, the Federal Circuit considered a statutory presumption that when the United States Customs Service ("Customs") classifies imported goods for tariff purposes, that classification decision "is presumed to be correct." 112 F.3d 488, 491 (Fed. Cir. 1997) (quoting 28 U.S.C. § 2639(a)(1) (1994)). In that case, the importer argued that the presumption of correctness applied only to factual disputes, while Customs argued that the presumption applied to the ultimate classification decision "and not merely to the underlying factual issue." Id. The Federal Circuit began by describing the presumption as "a procedural device that is designed to allocate, between the two litigants to a lawsuit, the burden of producing *evidence* in sufficient quantity." Id. at 492. Because "*facts* must be proven via *evidence*," the court acknowledged that the presumption "carries force on any

10

factual components of a classification decision." Id. However, the court held that "the presumption carries no force as to questions of law," as pure questions of law "lie within the domain of the courts" and "evidence is irrelevant to that legal inquiry." Id.; see also Anhydrides & Chems., Inc. v. United States, 130 F.3d 1481, 1486 (Fed. Cir. 1997) (stating, in a case involving the presumption of correctness, that "[e]videntiary presumptions set the burdens of proof and production, but they do not affect the determination of issues of law"). This Court believes that the same reasoning supporting the Federal Circuit's decision in Universal Electronics supports the conclusion that the presumption of validity, in a § 101 analysis, applies only to underlying questions of fact, not to pure questions of law.

While "[p]atent eligibility under § 101 presents an issue of law[,] . . . [t]his legal conclusion may contain underlying factual issues." Accenture Global Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1340–41 (Fed. Cir. 2013). If the validity of Listingbook's claims involves disputed issues of fact, the presumption of validity would place the burden on Market Leader to produce clear and convincing evidence on those issues. However, to the extent the validity of Listingbook's claims turns "not on factual disputes, but upon how the law applies to facts as given," Microsoft, 131 S. Ct. at 2253 (Breyer, J., concurring), no standard of proof will apply. See Affinity Labs of Tex., LLC v. DirecTV, LLC, --- F. Supp. 3d ---, 2015 WL 3764356, at *16 (W.D. Tex. 2015) ("[T]o the extent legal questions bear on the ultimate question of subject matter eligibility, the court will decide those questions as a matter of law. . . . To the extent questions of fact exist, the Court will apply the clear and convincing evidence standard." (footnote omitted)); Kickstarter, Inc. v. Fan Funded, LLC, No. 11 Civ. 6909(KPF), 2015 WL 3947178, at *5 n.7 (S.D.N.Y. June 29,

2015) (explaining that the clear and convincing standard of proof applies when the court makes factual determinations but not when the court draws legal conclusions).

### B. Abstract Ideas Analysis

Turning now to the first step of the <u>Alice</u> framework, the Court considers the claims at issue "in their entirety" to determine "whether their character as a whole" is directed to a law of nature, natural phenomenon, or abstract idea. <u>Internet Patents Corp. v. Active Network, Inc.</u>, 790 F.3d 1343, 1346 (Fed. Cir. 2015); <u>see</u> <u>Alice</u>, 134 S. Ct. at 2355. Market Leader contends the claims are directed to abstract ideas. (Def.'s Mem. 1, ECF No. 56.)

The Supreme Court and Federal Circuit have not articulated a precise definition for the term "abstract idea." <u>See</u> <u>Alice</u>, 134 S. Ct. at 2357 (declining to define "the precise contours of the 'abstract ideas' category"); <u>Versata Dev. Grp., Inc. v. SAP Am., Inc.</u>, 793 F.3d 1306, 1331 (Fed. Cir. 2015) (observing that while there is "more or less clear guidance" on how to apply the exceptions for laws of nature and natural phenomena, the exception for abstract ideas "is more of a problem, a problem inherent in the search for a definition of an 'abstract idea' that is not itself abstract").

Some guiding principles, however, have emerged from Supreme Court and Federal Circuit precedent. The courts have determined that mathematical formulas and algorithms, as well as fundamental economic principles, are abstract ideas. <u>See</u> <u>Alice</u>, 134 S. Ct. at 2356 (finding the concept of intermediated settlement, or "exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk," to be an abstract idea); <u>Bilski v. Kappos</u>, 561 U.S. 593, 611–12 (2010) (finding the concept of risk hedging to be an abstract idea); <u>Benson</u>, 409 U.S. at 71–72 (holding an algorithm for converting binary-coded decimal numerals to pure binary numerals to be patent-ineligible);

OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362–63 (Fed. Cir. 2015) (finding the concept of offer-based price optimization, a method of pricing products for sale, to be an abstract idea). Additionally, concepts that courts have found to be abstract have involved processes that humans can perform without the aid of a computer, such as processes that can be "done mentally" or using pen and paper. See, e.g., Benson, 409 U.S. at 67 (pointing out that the conversion of binary numerals can be done mentally using a mathematical table); Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (noting that "humans have always performed" the functions of collecting, recognizing, and storing data from a hard copy document); Planet Bingo, LLC v. VKGS LLC, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) (explaining that managing a game of Bingo "consists solely of mental steps which can be carried out by a human using pen and paper"). Further, abstract concepts have also involved methods of "organizing human activity," such as methods that provide instructions on how to hedge risk and how to budget. See, e.g., Alice, 134 S. Ct. at 2356 (describing risk hedging, at issue in Bilski, as a method of organizing human activity); Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1367 (Fed. Cir. 2015) (explaining that the abstract idea of budgeting "is not meaningfully different from the ideas found to be abstract in other cases . . . involving methods of organizing human activity"). With these principles in mind, the Court now considers the claims at issue in Listingbook's patent.

     1. *Claim 1*

Market Leader argues that "Listingbook's claims are directed to the abstract idea of sharing information between a real estate agent and her clients using generic computers." (Def.'s Mem. 20, ECF No. 56.) Listingbook denies that the claims of its parent are directed

to an abstract idea. (Pl.'s Opp'n 5, ECF No. 57.) It does, however, explain that it has commercialized "the inventions described and claimed in the '355 patent" in a client management system that "enables real estate agents and their clients to exchange information and collaborate on their online search activities." (Compl. ¶¶ 3–4, ECF No. 1.) While the parties disagree about whether Listingbook's claimed invention is abstract, their characterizations of the invention are remarkably similar. The Court believes the parties have accurately captured the character of Listingbook's invention. Claim 1 discloses a method of providing a real estate agent and two clients with access to a database of real estate information, monitoring the actions of the agent and clients as they access that information, generating and storing the information they access, and providing some client-accessed information to the agent and some agent-accessed information to the clients, so that each has "knowledge of the actions" of the other. At its core, this method embodies the ideas of information exchange (sharing) and collaboration.[4]

Courts have invalidated similar concepts as patent-ineligible abstract ideas. In Walker Digital, LLC v. Google, Inc., the District of Delaware considered claims directed to "the basic concept of controlled exchange of information about people," which it recognized had been "historically practiced by matchmakers and headhunters." 66 F. Supp. 3d 501, 508 (D. Del. 2014). The exchange of information could take place, for example, when a headhunter discloses the name of a job applicant to a company and the name of the company to the job applicant, but only when each has satisfied certain criteria required by the other. See id. at

---

[4] While both parties, as well as Claim 1, specify that the information exchange and collaboration takes place between real estate agents and their clients, "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use." Intellectual Ventures, 792 F.3d at 1366. References to the field of real estate therefore do not change the core concept of Listingbook's invention.

510. The court concluded that this controlled exchange of information was abstract. <u>Id.</u> at 509 n.3. In <u>Open Text S.A. v. Box, Inc.</u>, the Northern District of California evaluated a set of patents that shared a specification "describ[ing] the unremarkable concept of people working together on a project." 78 F. Supp. 3d 1043, 1044 (N.D. Cal. 2015). Though the collaboration took place online and did not require specialized software or "calling on a system administrator or IT person for help," the court explained that the core concept—"a method for people to collaborate and share information without the need for specialized software or expertise"—was abstract. <u>Id.</u> at 1045, 1047. Lastly, in <u>Telebuyer, LLC v. Amazon.com, Inc.</u>, the Western District of Washington considered patents related to electronic commerce, or "commercial transactions conducted electronically on the Internet." No. 2:13-cv-1677-BJR, 2015 WL 4493045, at *4 (W.D. Wash. July 23, 2015). The claimed inventions, instead of requiring buyers to sort through catalogs with large volumes of product information, used stored data about available products and buyers' interests to "provide e-commerce buyers with the most relevant product information and enable e-commerce vendors to target those buyers most likely to be interested in their products." <u>Id.</u> at *5. The court found that each claim was directed to "the abstract idea of connecting buyers and sellers," which is something "buyers and sellers have done since the dawn of commerce." <u>Id.</u> at *9–*10.

Drawing upon these cases, the Court finds no meaningful distinction for purposes of the § 101 analysis between the idea embodied in Claim 1 of Listingbook's patent—the idea of information exchange and collaboration—and the abstract ideas of a controlled exchange of information in <u>Walker Digital</u>, collaboration and information sharing in <u>Open Text</u>, and connecting buyers and sellers in <u>Telebuyer</u>. As in those cases, Claim 1 describes a

15

computerized version of a conventional interaction. Listingbook's patent specification confirms that real estate agents "conventionally" connect to a database of real estate information "to locate properties of interest for their clients." ('355 Patent 1:32–34, ECF No. 57-3.) They then contact each client to determine whether the client is interested in any of the resulting properties and whether the client has found any properties of interest from other sources, such as print advertisements or the Internet. (Id. at 2:29–36.) Through this interaction, the agent and clients have exchanged information and collaborated in the real estate search process. Listingbook's invention simply places the interaction online. (See Pl.'s Opp'n 11, ECF No. 57.) Listingbook argues that by allowing an agent to "collaborate with her client in an online environment," it has "enable[d] something that would otherwise be impossible." (Id.) It is well established, however, that "[a]n abstract idea does not become nonabstract by limiting the invention to a particular . . . technological environment, such as the Internet." Intellectual Ventures, 792 F.3d at 1366. The fact that Listingbook's method is performed online—rather than in an office, over the phone, or through email—does not change the Court's conclusion that Claim 1 is directed to an abstract idea. See also Content Extraction, 776 F.3d at 1347 (concluding that claims requiring a computer and scanner were "drawn to the basic concept of data recognition and storage," a well-known concept that "humans have always performed").

Listingbook disputes Market Leader's argument that Claim 1 is directed to an abstract idea by pointing out that "Market Leader has failed to support [its] assertion with clear and convincing evidence." (Pl.'s Opp'n 5, ECF No. 57.) In this case, however, the Court has failed to discern any issue of fact requiring evidentiary support, and Listingbook has not brought any to the Court's attention. At oral argument, Listingbook stated that Market

Leader "should [have] provide[d] some evidence that the actions that are claimed were, in fact, a traditional business process before the patent came about." The Court disagrees. As the Northern District of Illinois has explained,

> Although historical prevalence of a purported invention may help guide a court's analysis, it is not required in the <u>Alice</u> framework. Indeed, a court's role is not to determine how many centuries humans have engaged in a certain practice, but to determine whether a patent involves an idea, concept, or principle. So, although some cases do rely on historical evidence on the way to invalidating a patent as subject-ineligible, not surprisingly, many do not.

<u>Neochloris, Inc. v. Emerson Process Mgmt. LLLP</u>, --- F. Supp. 3d ---, 2015 WL 5951753, at *5 (N.D. Ill. 2015) (citations omitted). Moreover, Listingbook's own patent specification acknowledges that its claimed method is an improvement upon the conventional methods of real estate agents. After discussing the conventional system and its disadvantages, the specification states, "What is needed is a system and method for providing real estate information that does not include these disadvantages, and that offers other advantages." ('355 Patent 3:53–55, ECF No. 57-3.) To that end, Listingbook's invention is designed to "save many hours of work by real estate agents by automating property information functions and by offering easily-viewable, summary information helpful to real estate agents." (<u>Id.</u> at 6:47–51.) It also seeks to improve methods of communication between agents and clients in ways that "provide time savings to agents, are less disruptive to buyers, and speeds and improves communication." (<u>Id.</u> at 6:63–7:4.) Additionally, it provides "a private web-based service that is monitored for the agent's benefit," allowing agents to determine their clients' "true interests" and "which buyers are likely to buy and which buyers are merely browsing." (<u>Id.</u> at 7:5–16.) This examination of Listingbook's patent specification serves only to confirm that Claim 1 describes a computerized version of

17

conventional interactions between real estate agents and their clients, which this Court concludes is directed to the abstract ideas of information exchange (sharing) and collaboration.[5]

### 2. Dependent Claims

The dependent claims at issue in Listingbook's patent are "substantially similar and linked to the same abstract idea" as Claim 1, rendering it unnecessary for the Court to address each claim in detail. See Content Extraction, 776 F.3d at 1348 (stating that the district court "correctly determined that addressing each claim of the asserted patents was unnecessary" given its conclusion that all the claims were similar and linked to the same idea as the representative claims). These claims generally fall into two categories: (1) claims that elaborate on the method of Claim 1; and (2) claims that add to the method of Claim 1.

In the first category, Claims 3 to 5, 8, 16 to 18, 20 to 21, and 23 to 25 limit the method of Claim 1 by defining the types of actions that are monitored and the types of information that are exchanged. Claim 7 discloses that the real estate information database in Claim 1 is a "multiple listing database of properties in a geographical area." Claim 8 provides that the first client in Claim 1 is a buyer, while Claim 28 provides that the first client is a seller. In both claims, the second client is a buyer or a seller.

---

[5] Listingbook also argues that "undisputed evidence in the record contradicts the notion that claim 1 of the '355 patent fails to recite a concrete and tangible form or application." (Pl.'s Opp'n 9, ECF No. 57.) To support this argument, Listingbook points out that during the patent prosecution process, the patent examiner rejected certain claims under § 101 for failing to "produce a useful, concrete, and tangible result," but the examiner later accepted an amended claim that was ultimately issued as Claim 1. (Id. at 8.) From the fact that the examiner did not reject the claim a second time under § 101, Listingbook infers that the examiner recognized the amendments had "transformed the claim into one that had a 'concrete and tangible' form." (Id.) The Court declines to draw this inference, in that it is neither compelling nor persuasive.

In the second category, Claim 2 adds a notification feature for informing the agent when certain types of information are generated. Claims 6, 10, and 19 disclose limitations to improve the functioning of Claim 1's method, such as enabling the agent and client to review information at the same time, enabling the agent and client to identify new properties, and enabling the client to initiate an independent search in the real estate information database. Claims 8, 9, 22, 26, and 34[6] further limit the method of Claim 1 by adding data generation functions such as generating and automatically updating webpages containing summary information about client actions, property listings, comparable properties, and area sales.

Each of these dependent claims narrows the method of Claim 1 by adding details and functions to improve the information exchange and collaborative process, but none of these claims changes the concept at the core of the claimed method.

### 3. Independent Claims

Claims 37 and 38, the remaining claims at issue, are similarly linked to the abstract idea of Claim 1. Claim 37 is identical to Claim 1, except that where Claim 1 describes a "computer-implemented method" of providing real estate information, Claim 37 requires a "computer-readable medium for storing instructions which, when executed on a processor," perform the computer-implemented method of Claim 1. Claim 38 requires a "system" for providing the information described in Claim 1, comprising "a server," "a communications

---

[6] Market Leader does not specifically discuss Claim 34 in its brief. At oral argument, Listingbook argued that the Court should not address Claim 34 when deciding Market Leader's motion because Market Leader "never moved to invalidate Claim 34." However, as Market Leader pointed out at oral argument, its brief expressly challenges "the asserted claims" of Listingbook's patent. (See Def.'s Mem. 1, ECF No. 56.) Market Leader's references to "the asserted claims" make clear that it seeks to invalidate each of the claims Listingbook included in its Disclosure of Asserted Claims (ECF No. 29-6), which includes Claim 34. The Court therefore rejects Listingbook's argument and addresses Claim 34.

circuit for connecting the server to the internet," and a "component" for performing each step of Claim 1. These claims merely describe a system for implementing the method of Claim 1; they do not alter the abstract idea of Claim 1.

### C. Inventive Concept Analysis

Turning to the second step of the Alice framework, the question becomes whether the claims at issue contain an "inventive concept" that transforms the abstract idea into a patent-eligible application of that idea. See Alice, 134 S. Ct. at 2355. To render an abstract idea patent-eligible, the claims must contain something more than "well-understood, routine, conventional activity, previously engaged in by those in the field." See Mayo, 132 S. Ct. at 1298.

Here, the preamble of Claim 1 describes a "computer-implemented method." The law is clear, however, that a claim directed to an abstract idea does not become patent-eligible by "merely requir[ing] generic computer implementation." buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1354 (Fed. Cir. 2014) (alteration in original) (quoting Alice, 134 S. Ct. at 2357). The limitations of Claim 1 include additional elements of connecting to a database, storing client accounts, granting access to the database and accounts, monitoring account activity, generating and storing information, and providing information. Viewed separately, each step recites a conventional task that can be performed by a generic computer. The Federal Circuit has recognized that a database and user profile are both "generic computer elements." Intellectual Ventures, 792 F.3d at 1368. It has also invalidated claims involving the use of a computer to track and store information. Id. at 1367–68; see Alice, 134 S. Ct. at 2359 (explaining that "use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions" simply

20

implements an abstract idea on a generic computer); Content Extraction, 776 F.3d at 1348

(observing that data recognition and storage requires a computer "to perform well-

understood, routine, and conventional activities commonly used in the industry"). Sharing

collected and stored information, such as in the form of a webpage or report, similarly relies

on generic computer functions. See MicroStrategy Inc. v. Apttus Corp., --- F. Supp. 3d ---,

2015 WL 4425828, at *4 (E.D. Va. 2015) ("Even synthesizing large amounts of data and

generating numerous reports does not transform an idea into a patent-eligible one.") Thus,

viewed separately, the elements of Claim 1 do not supply an inventive concept. Viewed as

an ordered combination, the elements "ad[d] nothing . . . that is not already present when

the steps are considered separately," Alice, 134 S. Ct. at 2359 (alteration in original) (quoting

Mayo, 132 S. Ct. at 1298).

Listingbook argues that Claim 1 contains sufficient elements to survive the second

step of the Alice framework because the claim "is intrinsically tied to a machine" under the

machine-or-transformation test. (Pl.'s Opp'n 15, ECF No. 57.) The Federal Circuit

developed the machine-or-transformation test "in its efforts to make an 'abstract idea' less

abstract." Versata, 793 F.3d at 1332. "While the Supreme Court has held that the machine-

or-transformation test is not the sole test governing § 101 analyses, that test can provide a

'useful clue' in the second step of the Alice framework." Ultramercial, 772 F.3d at 716

(citations omitted). Under the machine-or-transformation test, a process can be patent-

eligible if "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular

article into a different state or thing." Id. (quoting In re Bilski, 545 F.3d 943, 954 (Fed. Cir.

2008) (en banc), aff'd on other grounds, Bilski, 561 U.S. 593 (2010)). Here, the machine-or-

transformation test does not save Listingbook's claim, as a generic computer is the only

21

machine needed to perform the method of Claim 1, and "adding a computer to otherwise conventional steps does not make an invention patent-eligible." Id. at 717.

The remaining claims likewise fail to supply an inventive concept, either viewed separately or together with the elements of Claim 1. In the dependent claims, the Court finds nothing inventive about monitoring specific types of actions, exchanging specific types of information, sending notifications, allowing multiple users to access information at the same time, allowing users to access and search databases, and generating and automatically updating data. Rather, these functions can all be performed using a generic computer connected to the Internet. See, e.g., Intellectual Ventures, 792 F.3d at 1368 (explaining that sending a notification through a communication medium is a generic computer task); DietGoal Innovations LLC v. Bravo Media LLC, 33 F. Supp. 3d 271, 287 (S.D.N.Y. 2014) (describing "retrieving information from a stored database" as "one of the most basic functions of the generic computer").

While the dependent claims recite generic computer functions, independent Claims 37 and 38 recite generic computer elements, including a "computer-readable medium for storing instructions" and a "system" comprising "a server," "a communications circuit for connecting the server to the internet," and a "component" for performing each step of Claim 1. These claims are similar to media claims in Alice describing "a computer-readable medium containing program code for performing the [claimed] method" and system claims describing "a computer system configured to carry out the [claimed] method." 134 S. Ct. at 2353. The media and system claims in Alice "fail[ed] for substantially the same reasons" as the method claims that the Court had already invalidated as patent-ineligible. Id. at 2360. As in Alice, Listingbook's claim for a storage medium fails with its method claim, as "[t]he

22

patent's invocation of generic computer-readable media to perform the method adds no inventive concept to the underlying abstract idea." <u>FairWarning IP, LLC v. Iatric Sys., Inc.</u>, No. 8:14-cv-2685-T-23MAP, 2015 WL 3883958, at *5 (M.D. Fla. June 24, 2015). Listingbook's claim for a computer system to implement the method of Claim 1 also fails because "[n]early every computer" includes components capable of performing the claimed method. <u>See</u> <u>Alice</u>, 134 S. Ct. at 2360. The Supreme Court explained in <u>Alice</u>, "The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea." <u>Id.</u> The same is true here. <u>See</u> <u>Accenture</u>, 728 F.3d at 1344 ("Because the system claim and method claim contain only 'minor differences in terminology [but] require performance of the same basic process,' they should rise or fall together." (quoting <u>CLS Bank Int'l v. Alice Corp. Pty. Ltd.</u>, 717 F.3d 1269, 1291 (Fed. Cir. 2013) (en banc) (Lourie, J., concurring), <u>aff'd</u>, 134 S. Ct. 2347 (2014))).

### D. Conclusion

The claims at issue in Listingbook's patent are directed to an abstract idea and lack an inventive concept to render the claims patent-eligible under § 101 of the Patent Act. Because there is no genuine dispute as to any material fact and Market Leader is entitled to judgment as a matter of law, the Court grants Market Leader's Motion for Summary Judgment.

For the reasons outlined herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Market Leader's Motion for Summary

Judgment (ECF No. 55) is GRANTED.

This, the 13th day of November, 2015.

/s/ Loretta C. Biggs

United States District Judge
